UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   HENRY VALENCIA, INC.,                     No. 20-10539-j11

Debtor.

## <u>MEMORANDUM OPINION</u>

Sherry Evans-Carmichael and Jeff Carmichael (together, the Carmichaels), *pro se*,
request approval of an administrative expense claim. The Carmichaels allege that they are
entitled to damages as a result of post-petition repair and restoration work on their customized
2003 GMC Safari van (the "Van") by Henry Valencia, Inc. ("Debtor").[1] Debtor counters that the
Carmichaels failed to pay for the work Debtor performed and contends further that the requested
damages do not qualify as an administrative expense claim under 11 U.S.C. § 503[2] payable from
the bankruptcy estate.[3] In addition, Debtor contends that even if the work it performed on the
Van may give rise to an administrative expense claim, the amount of the allowed claim must be
limited to the lesser of a) the amount necessary to repair the van, or b) the difference between the
fair market value of the van between the time it was brought to Debtor for repair and the fair
market value of the van when the Carmichaels picked up the Van from Debtor, plus possible
consequential damages for the time the Carmichaels were not able to use the Van while it was in
Debtor's possession.[4]

---

[1] *See* Carmichael's [sic.] Motion for Payment of Administrative Expenses Arising under the Regulations
Listed Below ("Application for Administrative Expense" – Doc. 183).
[2] All future references to "Code," "Section," and "§" are to Title 11 of the United States Code unless
otherwise indicated.
[3] *See* Objection to Carmichaels' Motion for Payment of Administrative Expenses ("Objection") – Doc.
186). The Carmichaels also filed a reply brief. *See* Doc. 201.
[4] *See* Debtor's Motion in Limine to Limit Presentation of Evidence ("Motion in Limine" – Doc. 226). Th
Carmichaels filed a response to the Motion in Limine (Doc. 229).

The Court held a final, evidentiary hearing over two non-consecutive days,[5] and took the matter under advisement. For the reasons explained below, the Court will grant the Carmichaels' request for approval of an administrative expense, in part, limited to loss of use damages in excess of the amount of their oral agreement with Debtor to repair the Van.

PROCEDURAL HISTORY[6]

Debtor operated a franchised Chevrolet Buick GMC car dealership in Espanola, New Mexico that first opened in 1980. Henry Valencia, who originally started the business, became ill over the past few years and could no longer effectively operate the business. His daughter, Margaret Valencia, took over the business operations in his absence. Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on March 10, 2020 as a small business debtor.[7] The Court confirmed Debtor's amended plan, as modified, on April 1, 2021.[8] Under the confirmed plan, Debtor intended to continue to operate its business until it could sell the dealership and all of its assets. Debtor ultimately sold all its remaining assets on June 10, 2022.[9]

In September of 2021, the Carmichaels filed a motion requesting the Court to order Debtor to return their Van which had been at Debtor for repairs.[10] On September 29, 2021, the

---

[5] On the Carmichaels' request the Court continued the final hearing date and extended various deadlines. *See* Order Extending Deadlines and Rescheduling Hearing on Motion for Allowance of Post-Petition Claim and Application for Payment of Administrative Expenses (Doc. 209) continuing the final hearing on the Application for Payment of Administrative Expenses from June 23, 2022 to August 3, 2022; Order Vacating and Rescheduling Final Hearing on Application for Payment of Administrative Expenses (Doc. 224), rescheduling the second day of the final hearing to October 28, 2022.

[6] The source of some of the information included in the procedural history is Debtor's Amended Disclosure Statement (Doc. 88). The remainder of the procedural history is taken from the docket of this bankruptcy case. The with the parties' consent, the Court took judicial notice of the docket and the documents filed of record in Debtor's bankruptcy case.

[7] Doc. 1.

[8] *See* Order Confirming Debtor's Modified Plan ("Confirmation Order" – Doc. 131). The Confirmation Order confirmed Debtor's Amended Chapter 11 Plan of Liquidation Dated January 4, 2021 (the "Plan" – Doc. 89), with a modification (Doc. 119) that resolved objections to the Plan.

[9] Doc. 212.

[10] Doc. 141.

Case 20-10539-j11    Doc 247    Filed 01/12/23    Entered 01/12/23 15:48:07 Page 2 of 23

Court entered an order directing Debtor to return the Van to the Carmichaels, and authorized the Carmichaels to file a motion for allowance of a post-petition claim in the bankruptcy case for any damage to the Van the Carmichaels assert Debtor caused.[11] When employees of the Debtor refused to return the Van to the Carmichaels on October 1, 2021 unless the Carmichaels paid the outstanding invoice for repairs, the Carmichaels filed a Motion to Enforce the Motion [sic] for Return of Vehicle (Doc. 141).[12] The Court granted that motion, in part, and directed Debtor to return the Van to the Carmichaels on November 3, 2021.[13] The Court also fixed a deadline for the Carmichaels to file a motion for allowance of post-petition claim.[14]

The Carmichaels filed a Motion for Allowance of Post-Petition Claim[15] and later filed an Application for Payment of Administrative Expense.[16] The Court held an evidentiary hearing on the motion and the application on August 3, 2022 and on October 28, 2022. On December 12, 2022, more than a month after the close of evidence, the Carmichaels filed a motion asking the Court to consider an additional invoice dated November 30, 2022 for repairs to the Van.[17] And on January 5, 2023, the Carmichaels filed yet another motion requesting compensation, submitting an additional invoice and other materials relating to repairs to the Van.[18] The Court will not consider these additional invoices and materials because the evidence was closed before the conclusion of the final hearing on October 28, 2022.

---

[11] Order Granting, in Part, and Denying, in Part, Motion for Return of Vehicle ("Order Directing Return of Van" - Doc. 146).
[12] Doc. 152.
[13] Order Granting, in Part and Denying in Part Carmichael Motion to Enforce ("Order Enforcing Order Directing Return of Van") – Doc. 159.
[14] *Id.*
[15] Doc. 163.
[16] Doc. 183.
[17] Doc. 242.
[18] Doc. 246.

FACTS[19]

The Carmichaels' Van is a customized van that accommodates Mrs. Carmichael's health needs. The Carmichaels often use the Van to drive across the country. Because it is an older vehicle (manufactured in 2003), the Van started needing significant repairs and tended to use oil. According to Mrs. Carmichael, the Van "want[ed] a makeover."

### The Agreement to Repair the Van

In January of 2021, the Carmichaels approached Debtor requesting an estimate for restoration and repair of the Van. At that time Debtor was a franchised GMC dealership. The Carmichaels went to Debtor because they were concerned about warranties and wanted a GMC dealership to perform the repairs to the Van. They also sought out Debtor because they knew that Debtor's mechanic, Richard Whiting, was a master mechanic. The Carmichaels provided a two-page list to Mr. Whiting, titled "GMC Safari (AWD) Van Restoration Cost Estimate"[20] (the "Scope of Work" or "SOW") identifying the items on the Van that the Carmichaels wanted addressed.[21] The first item on the list was to "install a new rebuilt engine" with a "manufacturer's warranty 3 years or 36,000 miles?"[22]

The Carmichaels insist that they wanted a "restoration" of the Van, not just mechanical and body repairs, and that they made their request for a vehicle restoration clear to Debtor. However, no one at Debtor informed the Carmichaels when they first approached Debtor seeking a restoration that Debtor does not undertake vehicle restorations. Ms. Valencia testified credibly

---

[19] Any additional facts set forth in the Discussion section of this Memorandum Opinion are incorporated by reference into the Facts section as fact findings.
[20] Exhibit 1, p. 4.
[21] The SOW includes the following:
    Install a new rebuilt engine (manufacturer's warranty 3 years of 36,000 miles?)
Exhibit 1, p. 4.
[22] *Id.*

that Debtor does not perform vehicle restorations. Ultimately, the Carmichaels and Debtor, through Richard Whiting, reached an oral agreement for Debtor to repair as many items on the SOW as Debtor was able to perform for $6,800, plus tax. Mr. Whiting estimated that it would take two to six weeks to complete those repairs, which included installation of a remanufactured engine in the Van. Debtor never provided the Carmichaels with a written estimate for repairs in excess of the agreed upon ceiling of $6,800 for repair work.

*The Repairs of the Van*

Debtor opened its repair job on the Van on February 11, 2021. [23] Sometime thereafter Debtor began working on the Van. The Carmichaels sent multiple emails to Ms. Valencia in an effort to follow up on the progress of the Van's repair.[24] Debtor's master mechanic, Richard Whiting, became ill sometime in the spring of 2021 and was not able to return to work. By June of 2021, Debtor was continuing to work on the Van. On June 15, 2021, the body shop manager, Jeff Mares, sent an email to Mr. Carmichael informing him that the old engine was removed from the Van and the new engine was being prepped for installation.[25] Mrs. Carmichael responded the next day asking Mr. Mares please to "do a good job," inquiring about "the estimated time frame for completion of the agreed upon work" and asking if it would be possible "to get a loaner vehicle from the dealership if [Debtor] cannot complete the agreed upon work before" the Carmichaels needed the Van.[26] There is no evidence that Debtor responded to the Carmichaels' request for a loaner vehicle.

On July 7, 2021, Ms. Valencia sent the Carmichaels an email stating that she was "praying" that all work on the Van should be completed by the afternoon of Friday, July 9,

---

[23] *See* July Invoice (defined below).
[24] *See* Exhibit 20.
[25] *See* email dated June 15, 2021 – Exhibit 20, p. 6.
[26] Email dated June 16, 2021 – Exhibit 20, p. 7.

2021.[27] On July 9, 2022, Ms. Valencia sent the Carmichaels an email message stating that she was unable to give the Carmichaels a final repair estimate until Monday July 12, 2021 because one of Debtor's employees was not at work that day because his father's home burned down and he needed to be with his family, but that he may come in and finish the estimate on July 10, 2021.[28]

On July 27, 2021, Ms. Valencia sent the Carmichaels an email message stating that the employee in question was back to work, wrapping up work on a dent, but still needs to paint it, and that hopefully the Van would be completed that week.[29]

Near the end of July 2021, Debtor issued a "pre-invoice" for repairs to the Van, reflecting an "open date" of February 11, 2021 and a "close date" of July 30, 2021 (the "July Invoice").[30] The July Invoice includes an itemized list of repairs and installed items, including a remanufactured engine. The total amount billed on the July Invoice is $8,780.83. The Carmichaels received the July Invoice from Debtor in July of 2021, but they did not pick up the Van at that time because some items still needed repair. The amount of the July Invoice exceeded the agreed upon ceiling of $6,800 for the repairs. There is no evidence that the Carmichaels ever agreed that repairs could be performed that exceeded the agreed $6,800 repair cost.

In August of 2021, an employee of Debtor took Mrs. Carmichael as a passenger for a test drive of the Van. The Van did not perform well on the test drive. In addition, Mrs. Carmichael noticed damage to the mirrors and paint that she did not think existed when the Carmichaels originally brought the Van to Debtor for repairs. Further, door locks on the Van that the

---

[27] Email dated July 7, 2021, Exhibit 23, p 5.
[28] *See* Exhibit 23, p. 4.
[29] *Id*.
[30] Exhibit 8.

-6-

Carmichaels believe were fine when they brought the Van to Debtor were broken as of the date

of the test drive. After the test drive, the Carmichaels sent an itemized list by email to Debtor

asking Debtor to check off each item that was repaired and identify what parts were changed.[31]

Debtor never returned that checklist to the Carmichaels.

By the end of August 2021, the Carmichaels decided that they did not want Debtor to

perform any more work on the Van and intended to negotiate with Debtor for an agreed payment

for the work Debtor had performed on the Van.[32] In an email dated August 31, 2021 sent to Ms.

Valencia, the Carmichaels offered to "close this deal by accepting our payment of $6,800 plus

tax and allowing us to pick up our GMC Van today or ASAP."[33] Debtor did not accept the offer.

In October 2021, Debtor issued a second "pre-invoice" for repairs to the Van reflecting

an "open date" of February 11, 2021 and a "close date" of October 5, 2021 (the "October

Invoice"). Except for the new close date, the October Invoice is similar but not identical to the

July Invoice.[34] The total amount of the October Invoice is $8,744.51.[35] The Carmichaels have not

paid either invoice. Some of the delay in completing the work occurred because it took a long

time to get parts, especially a remanufactured engine. The evidence does not establish the

amount of the delay that was attributable to supply chain problems or the dates spanning the

supply chain delay.

Repaired items identified on the July Invoice and the October Invoice include the

following:

---

[31] *See* Exhibit 20, pp. 16 – 20.
[32] *See* Exhibit 20, p. 20; Exhibit 23, p. 8.
[33] Exhibit 20, p. 20.
[34] Page 1 of the October Invoice is identical to the July Invoice, but page 2 of the October invoice reflects different amounts for some of the same repairs identified in the July Invoice and page 3 of the October Invoice identifies some additional repairs that were not included in the July Invoice.
[35] *Id.* Curiously, as Mrs. Carmichael pointed out, both the July Invoice and the October Invoice reflect the same mileage for the Van.

> Installed remanufactured engine
> Installed SL-N-Pump Kit
> Installed SL-N-Gasket Kit
> Installed SL-N-Thermostat
> Installed Oil Pan Set[36]

Debtor also completed some body repairs, including repair of a dent. Ms. Valencia testified that the dent on the left quarter panel was pretty large and was not part of the initial scope of work. The Carmichaels testified to the contrary that Mr. Whiting looked at the dent and said it could be fixed as part of the original oral agreement.[37] Debtor also detailed the interior of the Van at no charge to the Carmichaels.

### *The Return of the Van to the Carmichaels*

The Carmichaels presented this Court's Order Directing Return of Van to Debtor[38] on October 1, 2021, but employees of the Debtor refused to return the Van to the Carmichaels unless the Carmichaels paid the outstanding invoice for repairs. Debtor eventually returned the Van to the Carmichaels on November 3, 2021 pursuant to the Order Enforcing Order Directing Return of Van.[39] When the Carmichaels picked up the Van from Debtor, they immediately had the Van loaded on a flatbed truck which took the Van directly from Debtor's business to Octane Buick in Santa Fe, New Mexico. Octane Buick performed a multi-point inspection of the Van (the "Octane Inspection"), which identified certain repair work that was needed.[40] The Carmichaels did not have Octane perform the identified repairs.

### *Additional Repairs to the Van After it was Returned*

---

[36] Exhibit 8.
[37] Exhibit 8 – July Invoice and October Invoice reflect replaced door handle and mirrors, back door hinges; paint, etc.
[38] Doc. 146.
[39] Doc. 159.
[40] Exhibit 25.

-8-

Mrs. Carmichael has some experience with vehicle repairs and maintenance. Her father taught her how to work on her own vehicles and, for fun, she took some evening classes on how to repair carburetors. After the Carmichaels picked up the Van from Debtor, Mrs. Carmichael took several photos of the Van in an effort to identify the items she believes were damaged or not properly repaired by Debtor.[41] Mrs. Carmichael's testimony and pictures fall short of establishing that Debtor caused damage to the Van.

Since November, 2021, the Carmichaels have taken the Van to various mechanics and a body shop for repairs and repair estimates. The following chart summarizes those repair costs and estimates for the Van since November 2021:

| Mechanic/Repair/Body Shop | Date of Service | Estimate or Paid Expense | Amount |
| --- | --- | --- | --- |
| Octane[42] | 11/19/21 | Estimate for repairs | $3,157.50 |
| Los Alamos Shell[43] | 2/7/22 | Paid | $1,886.25 |
| Auto Angel, Inc.[44] | 3/22/22 | Paid | $5,651.47[45] |
| Auto Angel, Inc.[46] | 6/21/22 | Paid | $1,500.78 |
| Extreme Twist[47] | 5/4/22 | Estimate for body repairs | $4,974.97 |

---

[41] Exhibit 5, pp. 38 - 48.

[42] Exhibit 25.

[43] Exhibit 25.

[44] Exhibit 25.

[45] Exhibit 25 includes a certification from a representative of Auto Angel, Inc. that the invoice is part of the business records of Auto Angel. However, the invoice attached to the certification does not include all pages of the invoice. Exhibit 9 contains all pages of the invoice at pp. 12 – 13, but those pages were not admitted into evidence. Mrs. Carmichael also testified that the Carmichaels paid Auto Angel, Inc. $5,651.47 for the repairs Auto Angel, Inc. completed relating to this invoice. In addition, a copy of the Carmichaels' credit card bill (Exhibit 3 to Doc. 229) admitted into evidence shows a charge of $5,651.47 to "The Auto Angel Santa Fe NM." The Court will accept the testimony of Mrs. Carmichael together with the credit card statement as sufficient evidence of the total amount of the invoice from Auto Angel, Inc. as reflected in admitted Exhibit 25.

[46] Exhibit 25.

[47] Exhibit 25 includes a certification from a representative of Extreme Twist that the estimate is part of the business records of Extreme Twist. The estimate attached to the certification does not include all pages of the estimate. Exhibit 9 contains all pages of the estimate at pp. 16 – 19. The purpose of the certifications was to provide evidentiary support for the admission of the invoices and estimates that are part of Exhibit 9.

A close comparison of the repair invoices and estimates appears to suggest recurring problems with the Van related to oil leaks. The July Invoice and October Invoice from Debtor identify an installed oil pan set with an associated charge of $59.48.[48] The invoice from Los Alamos Shell includes the following description for parts and labor and associated charges:[49]

| Part/Labor description | Charge |
|---|---|
| Oil pan & timing cover gskts | $68.72 |
| Engine oil cooler lines | $159.23 |
| Oil filter & cooler gaskets | 23.12 |
| Replace oil pan gasket, timing cover, water pump, belt . . . oil cooler lines + pls cooler lines | $600.00 |
| Total: | $851.07 |

The repair estimate from Octane Buick GMC of Santa Fe also identified "oil cooler lines leaking" with an associated cost of $443.00 and "Engine Oil Pan Reseal" with an associated cost of $374.00.[50] Finally, Invoice 47989 from Auto Angel, Inc. dated June 21, 2022 includes "CRANKSHAFT OIL SEAL – Remove & Replace – Front" with an associated cost of $322.40.[51]

*No Proof that Debtor Performed Substandard Work*

Historically, the Van tended to use oil, which is why the Carmichaels initially brought the Van to Debtor for repairs. Mrs. Carmichael testified that when they first brought the Van to Debtor, it did not leak oil, but after its return, the Van leaked oil, as evidenced by oil under the Van in their driveway.

---

[48] Exhibit 8.
[49] Exhibit 25.
[50] Exhibit 25.
[51] Exhibit 25.

Nevertheless, is not possible for this Court without the aid of expert testimony to determine, by comparing the July Invoice and October Invoice from Debtor with the invoices for repairs performed by Auto Angel, Inc. and Los Alamos Shell, whether the repairs to the Van performed after the Carmichaels obtained their Van from Debtor are to the same items Debtor undertook to repair or are otherwise directly related to the remanufactured engine Debtor installed in the Van.

The Carmichaels did not call a mechanic from Auto Angel, Inc. or Los Alamos Shell, or any other expert witness, to testify at the final hearing regarding whether any of the repair work Debtor performed was substandard. Without the aid of such testimony, the Court is unable to make any findings regarding whether any of the repair work Debtor performed was substandard. Mr. Carmichael testified that many of the problems Octane identified in its multi-point check were problems the Carmichaels were unaware of when they took the Van to Debtor for repairs. The repair of those problems was outside of Debtor's agreed scope of work on the Van.

Further, without testimony by a mechanic from Auto Angel, Inc. or Los Alamos Shell, or any other expert witness, the Court is unable to make any findings regarding whether any of the repair work performed by Auto Angel, Inc. or Los Alamos Shell was necessitated because Debtor's repair work was substandard. The repair invoices from Auto Angel, Inc. and Los Alamos Shell all include some type of oil leak repair, but it is not possible for the Court, absent expert testimony explaining the significance of those invoices as compared with the work Debtor performed, to determine whether Debtor's repairs or the remanufactured engine it installed was a cause of the need for the subsequent repairs to the Van.

-11-

*Unreasonable Delay in the Completion of the Repair Work*

Debtor undertook to repair the Van in February of 2021 based on the parties' oral agreement but did not return the Van to the Carmichaels until November 3, 2021. Debtor's mechanic, Richard Whiting, estimated it would take four to six weeks to repair the Van. It took much longer. Ms. Valencia testified that some of the delay was due to a delay in obtaining a remanufactured engine and parts after the COVID pandemic, yet the evidence failed to establish the time span for the delay. Mr. Whiting became ill sometime in the spring of 2021 and never returned to work. There is no evidence of any communications between the Carmichaels and Debtor from February 11, 2021, which coincides with the "Open date" of the July Invoice and October Invoice,[52] until April 27, 2021, when Ms. Valencia informed the Carmichaels by email that their "vehicle is torn apart unfortunately the tech has not worked on it for the last few working days."[53] An email dated June 15, 2021 from Debtor's body technician, Jeff Mares, to the Carmichaels similarly indicates that "the old engine has been removed from vehicle, and new engine is being prepped to be installed as we speak."[54]

Taking into account all of the facts and circumstances, including but not limited to Debtor's initial four-to-six week estimate to complete the repairs, the departure of Debtor's master mechanic sometime in the spring of 2021, the apparent lack of communication from Debtor to the Carmichaels from mid-February through the end of April 2021, the start-time for installation of the remanufactured engine in mid-June 2021, and Debtor's expectation that all repairs would be completed by July 9, 2021, the Court finds that a reasonable time for completion of the repair work was at least by July 9, 2021.

---

[52] *See* Exhibit 8.
[53] Exhibit 20, p. 5.
[54] Exhibit 20, p. 6.

The repair work on the Van was not completed by July 9, 2021. The Carmichaels continued to wait for completion of the repairs. On August 31, 2021, the Carmichaels sent an email to Ms. Valencia demanding that Debtor stop all work on the Van and offering to pay Debtor the agreed upon $6,800 in exchange for the return of the Van.[55] Debtor did not return the Van to the Carmichaels at that time and did not accept the Carmichaels' offer. Further, Debtor refused to return the Van to the Carmichaels based on the Order Directing Return of Vehicle, entered September 29, 2021,[56] and did not return it until the Carmichaels obtained a second order from the Court enforcing its prior order.

*Additional Expenses Due to Loss of Use of the Van*

While the Van was in Debtor's possession, Mr. Carmichael had to travel to Indiana to attend to family matters. He testified that he would have ordinarily driven the Van, but because the Van was not available, he flew to Indiana. The Carmichaels include the airfare for the trip to Indiana as part of their administrative expense claim. The Court finds Mr. Carmichaels' testimony that he would have driven the Van to Indiana not particularly credible. Although the Carmichaels historically used the Van to travel cross country to Indiana, the emergency nature of Mr. Carmichael's trip suggests that he would have flown regardless of whether the Van was available. While in Indiana, Mr. Carmichael rented a car for a total cost of $605.60 from July 19, 2021 through July 28, 2021, a period of nine days.[57] On a second trip to Indiana from September 25, 2021 to September 30, 2021, Mr. Carmichael rented a car for a total cost of $415.20.[58] The average daily car rental rate, taking into account both rental charges, is $72.91.[59]

---

[55] Exhibit 20, p. 20.
[56] Doc. 146.
[57] Exhibit 24, p. 1. Page 1 of Exhibit 24 reflects an initial rental charge of $1320.57, which was reduced by $714.97 to correct an overcharge.
[58] *Id.*
[59] Total rental charges = $1,020.80 ÷ 14 days = $72.91 per day (average).

-13-

The Carmichaels also seek to recover mileage costs incurred for driving to the courthouse, driving to Octane, driving to Debtor, as well as the towing costs for transporting the Van to Octane, the cost for the multi-point inspections of the Van by Octane, and the cost of insurance they paid on the Van while it was in Debtor's possession.

Because the Carmichaels needed a second reliable vehicle and did not have the Van, the Carmichaels eventually purchased a 2008 GMC Savana (the "2008 Savana") with 38,000 miles on it for $28,300.[60] In addition, the Carmichaels put extra miles on their existing 2018 truck while the Van was in Debtor's possession.

*Van Valuation Estimates*

After the Carmichaels recovered the Van from Debtor and before any additional repair work was completed on the Van, the suggested retail value of the Van prepared by Chevrolet Cadillac as of November 30, 2021 was $4,839.00.[61] There is no evidence before the Court regarding the cost to customize the Van to accommodate Mrs. Carmichael's health needs.

The Van had at least 240,390 miles on it when it was first delivered to Debtor for repairs.[62] Kelly Blue Book values for a 2003 GMC Safari Passenger SLE Extended Minivan 3D with 240,734 miles range from $1,905 to $3,339.[63] A posting from Reliable Car-N-Care reflects a listing price of $9,995 for a used 2003 GMC Safari AWD.[64] Neither the Kelly Blue Book values nor the Reliable Car-N-Care listing price are specific to the Carmichaels' Van.

Other than the test drive in August of 2021, the Carmichaels did not have access to the Van from February 11, 2021, when they left it with Debtor for repairs, through November 3,

---

[60] Exhibit 10.
[61] Exhibit 5, p. 33.
[62] Exhibit 23, p. 3.
[63] New Exhibit A, New Exhibit B, and Exhibit C.
[64] Exhibit 6 to Doc. 229, pp.14-15 admitted into evidence.

-14-

2021 when Debtor returned the Van to the Carmichaels as directed by the Court's Order Enforcing Order Directing Return of Van. Debtor did not return the Van to the Carmichaels on October 1, 2021 when the Carmichaels presented to Debtor the Court's first Order Directing Return of Van.

DISCUSSION

In their Application for Administrative Expense, the Carmichaels requested payment of $16,756.74[65] from the bankruptcy estate for damages the Carmichaels assert Debtor caused as a result of Debtor's alleged improper repair of the Van.[66] The Court will first examine whether such damages can constitute an administrative expense claim under § 503. Next, the Court will determine whether the Carmichaels have established a claim for breach of their oral contract with Debtor to repair the Van for $6,800, and, if so, whether the Carmichaels are entitled to damages as a result of the breach.

A. Whether damages arising from breach of a post-petition contract made in the ordinary course of a chapter 11 debtor's business operations can constitute an administrative expense claim

Section 503 governs administrative expense claims, which are entitled to priority under § 507(a)(2). To be compensable from the bankruptcy estate as an administrative expense, the claim must fit within one of the categories enumerated in subsection (b) of § 503. *In re Mid Region Petroleum, Inc.*, 1 F.3d 1130, 1132 (10th Cir. 1993). Under § 503(b)(A), administrative

---

[65] *See* Application for Administrative Expense (Doc. 183) – Exhibits A, B, and C.

[66] At the final hearing, the Carmichaels also put on evidence that Debtor violated certain state regulations requiring mechanics to provide written estimates for repair before starting repairs work. Because the Application for Administrative Expense did not include such a claim, the Court will not consider it. At closing argument, the Carmichaels increased the amount requested to $20,444.15, and after the close of evidence, the Carmichaels filed The Carmichael's Motion Containing Additional Cost Information seeking to supplement the requested claim amount by $1,541.64 for repairs done by Auto Angel, Inc. on November 30, 2022. *See* Doc. 242. The Carmichaels filed another motion on January 5, 2023 submitting another invoice and additional repair information. *See* Doc. 246 By separate order the Court will deny those motions.

-15-

expenses include "the actual, necessary costs and expenses of preserving the estate . . . . " In general, "[t]o be deemed an administrative expense, the expense must: (1) arise out of a transaction between the creditor and the . . . debtor-in-possession; and (2) benefit the debtor-in-possession in the operation of the business." *Mid Region*, 1 F.3d at 1133 (citing *In re Amarex, Inc.,* 853 F.2d 1526, 1530 (10th Cir. 1988)); *see also In re Energy Future Holdings Corp.,* 990 F.3d 728, 741 (3d Cir. 2021) (a claim is entitled to administrative expense priority "if: (1) there was a 'post-petition transaction between the claimant and the estate,' and (2) those expenses yielded a 'benefit to the estate.'" (quoting *In re Women First Healthcare, Inc.,* 332 B.R. 115, 121 (Bankr. D. Del. 2005))). The party requesting an administrative expense claim bears the burden of proving by a preponderance of the evidence that it is entitled to an administrative expense claim. *Mid Region*, 1 F.3d at 1132 (the party claiming administrative expense bears the burden of proof); *In re Rancher's Legacy Meat Co.*, 630 B.R. 308, 315 (Bankr. D. Minn. 2021) (preponderance of the evidence standard).

"Actual, necessary, costs" under § 503(b)(1)(A) can include "less readily calculable benefits, such as the ability to conduct business as usual." *Matter of TransAmerican Nat. Gas Corp.,* 978 F.2d 1409, 1420 (5th Cir. 1992). Thus, if it benefits the estate for the debtor to continue to operate its business, unpaid obligations the debtor in possession incurs in the ordinary course of conducing its business under a post-petition contract to which it is a party generally will be entitled to administrative expense status as a necessary cost and expense of preserving the estate. *See In re Texas Wyoming Drilling, Inc*., 486 B.R. 746, 758 (Bankr. N.D. Tex. 2013) ("[A] claim for the breach of a postpetition contract is often afforded administrative expense priority . . . ."). Similarly, the scope of § 503(b)(1)(A) can "encompass tort claims arising from postpetition conduct undertaken in the operation of the estate's business." *Redmond*

*v. NCMIC Fin. Corp. (In re Brooke Corp.),* 485 B.R. 650, 659 (Bankr. D. Kan. 2013). Thus, the Carmichaels' claim for post-petition damages Debtor allegedly caused to the Van while in Debtor's possession under a post-petition repair contract Debtor, as debtor in possession, entered into in the ordinary course of conducting its business can constitute an administrative expense claim entitled to priority under § 503(b). *See Peters v. Pikes Peak Musicians Ass'n*, 462 F.3d 1265, 1268 (10th Cir. 2006) (explaining that § 503(b) establishes administrative expense claims, and § 507, in turn, assigns payment priorities for different types of claims).

Under a post-petition contract to which it is a party, Debtor as debtor in possession undertook to repair the Carmichaels' Van while it continued to operate its business until it could sell its assets as contemplated under its confirmed plan. Damages Debtor allegedly caused to the Van while undertaking repairs can constitute an administrative expense recoverable from the bankruptcy estate because they resulted from Debtor's continued post-petition operation of its business. However, before the Court can award the Carmichaels an administrative expense claim, the Court must determine the following:  a) whether the Carmichaels have established that Debtor is liable to them for breach of the oral contract to repair the Van, and b), if liability is established, whether the Carmichaels have met their burden of proving any damages. *See Mid Region,* 1 F.3d at 1132 (administrative expense claimant bears the burden of proof).

B.  Whether the Carmichaels have established Debtor's liability

To sustain a claim for breach of contract under New Mexico law, a plaintiff must establish "the existence of the contract, breach of the contract, causation, and damages." *Abreu v. N.M. Children, Youth and Families Dep't*, 797 F.Supp. 2d 1199, 1247 (D.N.M. 2011) (citing *Camino Real Mobile Home Park P'ship v. Wolfe*, 1995-NMSC-013, ¶ 18, 119 N.M. 436, 442, 891 P.2d 1190, 1196, *overruled on other grounds by Sunnyland Farms, Inc. v. Central N.M.*

*Elec. Co-op, Inc.*, 2013-NMSC-017, ¶¶ 11, 14-16, 301 P.3d 387). The evidence establishes that the Carmichaels had an oral contract with Debtor to repair as many items on the SOW as Debtor could for $6,800. A contract for repair generally carries an implied warranty imposed by law to complete the repair in a workmanlike manner with the ordinary skill of those who undertake that type of work. *See Mascarenas v. Jaramillo*, 1991-NMSC-014, ¶ 8, 111 N.M. 410, 412, 806 P.2d 59, 61 ("[W]e have long recognized that breach of implied warranty by a tradesman to perform in a skilled and workmanlike fashion is a common-law theory of recovery in New Mexico."); *Adobe Masters, Inc. v. Downey,* 1994-NMSC-101, ¶ 3, 118 N.M. 547, 548, 883 P.2d 133, 134 ("When professional services arising from a contract are substandard, a plaintiff may bring a cause of action . . . for breach of contract arising from the breach of the implied warranty to use reasonable skill.").[67]

The Carmichaels assert that Debtor improperly repaired the Van, causing damage to the Van. However, the Carmichaels have failed to establish that Debtor did not repair the Van in a workmanlike manner in breach of the implied warranty to use reasonable skill to complete the repairs. No expert testimony was offered that would establish substandard work by Debtor or which repairs on the invoices and repair estimates for the Van after it was returned to the Carmichaels are attributable to repairs Debtor undertook to complete as stated in the July Invoice and the October Invoice. Mrs. Carmichael's testimony describing the pictures she took of the Van after the Carmichaels recovered the Van from Debtor failed to establish that Debtor caused

---

[67] *See also Robey v. Parnell*, 2017-NMCA-038, ¶ 29, 392 P.3d 642, 651 (imposing an implied warranty in a contract for drilling a water well that "the work shall be done in a workmanlike manner with the ordinary skill of those who undertake such work." (quoting *Davis v. Merrick*, 1959-NMSC-084, ¶ 6, 66 N.M. 226, 228, 345 P.2d 1042, 1043)); *Cowan v. D'Angelico*, No. CIV 09-0483 RB/LFG, 2010 WL 9067968, at *4 (D.N.M. March 25, 2010) ("New Mexico law requires a contract between the parties to support an implied warranty to use reasonable skill and perform in a workmanlike manner.").

the problems after the Carmichaels left the Van in Debtor's possession for repairs. Because the Carmichaels failed to prove that Debtor breached the contract by failing to complete the repairs to the Van in a workmanlike manner, the Carmichaels are not entitled to any damages resulting from that alleged breach.

The oral agreement between the Carmichaels and the Debtor did not specify a time for completion of the repairs to the Van, although Debtor provided the Carmichaels with an estimate that the repairs could be completed within four to six weeks. When "a contract is silent on an issue, the law implies a reasonable term to cover that issue." *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 67, 299 P.3d 844, 861 (quoting Melvin Aron Eisenberg, *Probability and Chance in Contract Law*, 45 UCLA L. Rev. 1005, 1027 (1998)); *Castle v. McKnight*, 1993-NMSC-076, ¶ 9, 116 N.M. 595, 598, 866 P.2d 323, 326 ("[I]f a contract is silent regarding the manner of performance, 'a term which is reasonable in the circumstances is supplied by the court.'" (quoting Restatement (Second) of Contracts § 204 (1981)). If the missing contract term is the time for performance, the law will imply a reasonable timeframe. *Smith v. Galio*, 1980-NMCA-134, ¶ 5, 95 N.M. 4, 7, 617 P.2d 1325, 1328 ("Where a contract is silent as to the time of performance, the law implies that it is to be performed within a reasonable time." (citing *Hagerman v. Cowles*, 1908-NMSC-015, 14 N.M. 422, 94 P. 946). The period of that implied reasonable timeframe is a question of fact. *Beaver v. Brumlow*, 2010-NMCA-033, ¶ 30, 148 N.M. 172, 180, 231 P.3d 628, 636.

*Loss of Use Damages*

Wrongful detention or prevention of use of personal property, such as a vehicle, can give rise to damages for the value of the use of that property during the detention period. *See*

Restatement (Second) of Torts § 931 (1979).[68] For loss of use damages attributable to detention or prevention of use of a vehicle, a plaintiff is entitled to the rental value of the vehicle for the detained period. *See* Restatement (Second) of Torts § 931 (1979), Comment b., Illustration 2. ("A detains B's automobile for a period of one month. The car was used merely for B's pleasure and during this month B does not use another car. The rental value of the car is $50 for that period. B is entitled to damages of $50."); *see also Cress v. Scott*, 1994-NMSC-008, ¶ 4, 117 N.M. 3, 5, 868 P.2d 648, 650 ("The New Mexico uniform jury instructions define loss-of-use damages as '[t]he reasonable rental of similar property used during the time reasonably required for the repair of the damaged property.'" (quoting SCRA 1986, 13-1818 (Repl. Pamp. 1991)). This is so regardless of whether a plaintiff actually incurs expenses to rent a vehicle. *Cress v. Scott*, 1994-NMSC-008,  at ¶ 7, 117 N.M. at 6, 868 P.2d at 651 ("[L]oss-of-use damages may be measured by the reasonable rental value of a substitute vehicle, even in the absence of actual rental."); *Behrens v. Gateway Ct., LLC*, 2013-NMCA-097, ¶11, 311 P.3d 822, 826 ("[W]hen loss of use damages are appropriate, the appropriate measure of the damages is the reasonable rental value of the substitute property even in the absence of actual rental." (citing *Cress,* 1994-NMSC-008 at ¶ 7, 117 N.M. at 6, 868 P.2d at 651).

The Carmichaels' travel expenses for two trips to Indiana included a rental car. On the first trip, Mr. Carmichael rented a car from July 19 to July 28, 2021 for a total cost of $605.60.

---

[68] If one is entitled to a judgment for the detention of, or for preventing the use of, land or chattels, the damages include compensation for
     (a) the value of the use during the period of detention or prevention or the value of the use of or the amount paid for a substitute, and
     (b) harm to the subject matter or other harm of which the detention is the legal cause.
Restatement (Second) of Torts § 931 (1979).

On the second trip, Mr. Carmichael rented a car from September 25 to September 30, 2021 for a total cost of $415.20. Based on those charges, the average daily rental charge is $72.91.[69]

The Court has found that Debtor reasonably should have completed the repairs to the Van at least by July 9, 2021. The Carmichaels are entitled to loss of use damages for the delay in the return of the Van after that date measured by the reasonable cost of renting a car during the period of delay. At a daily rental of $72.91 for the period from July 9, 2021, when Debtor reasonably should have completed the repairs to the Van, through November 3, 2021, when Debtor eventually returned the Van to the Carmichaels pursuant to the Court's order, the Carmichaels suffered loss of use damages in the amount of $8,530.47 resulting from Debtor's breach of the implied term to complete the repairs to the Van within a reasonable time.[70]

However, this amount must be offset by the amount the Carmichaels agreed to pay Debtor to repair the Van. The parties had an oral agreement to repair the Van for $6,800, plus tax, yet the Carmichaels did not pay Debtor anything for the work Debtor performed, including installation of a remanufactured engine, which the October Invoice states has a "3 yr 100,000 mile warranty."[71] Reducing the loss of use damages by $6,800, plus tax in the amount of $597.34[72] results in net loss of use damages of $1,133.13.[73]

## CONCLUSION

None of the Carmichaels' other requested damages, such as mileage, towing costs, travel expenses, or the cost to purchase a replacement vehicle, are recoverable. The Carmichaels failed to prove that Debtor breached the implied warranty in the oral agreement to repair the Van in a

---

[69] It is appropriate to use the average daily rental charge rather than a long-term rental rate because the date the repairs actually would be completed was unknown.
[70] 117 days X 72.91 = $8,530.47.
[71] Exhibit 8.
[72] Based on the July Invoice, the sales tax rate is 8.7844%. $6,800 x .087844 = $597.34.
[73] $8,530.47 – ($6,800 + $597.34) = $1,133.13.

workmanlike manner. Moreover, even if the Carmichaels had established that Debtor improperly repaired the Van in breach of the oral agreement, awarding the Carmichaels damages for airfare for trips to Indiana Mr. Carmichael would have taken regardless of whether he had access to the Van, for mileage on the Carmichael's other vehicles, or for the cost of a replacement vehicle, would put the Carmichaels in a better position than they would have been had they not engaged Debtor to repair the Van. "The philosophy of the law is to fully and fairly compensate an injured person for his losses, not to place him in a better position than he would have held had it not been for the injury." *Ohio Oil Co. v. Elliott*, 254 F.2d 832, 835 (10th Cir. 1958). *See also Hubbard v. Albuquerque Truck Center, Ltd.*, 1998-NMCA-058, ¶ 15, 125 N.M. 153, 157, 958 P.2d 1111, 115 ("'[D]amage awards should provide full and just compensation for the injured party' . . . . [which] is synonymous with the concept of making the injured person whole." (quoting *Camino Real,* 1995-NMSC-013 at ¶ 19, 119 N.M. at 443, 891 P.2d at 1197, *overruled on other grounds by Sunnyland Farms,* 2013-NMSC-017 at ¶ 16, 301 P.2d at 393)).

Although the Carmichaels did not prove that Debtor breached the implied warranty in the oral agreement to repair the Van in a workmanlike manner, they established that Debtor breached the implied term in the oral agreement to repair the Van within a reasonable timeframe. The damages and consequent administrative expense claim are, therefore, limited to loss of use damages. The Court concludes that the Carmichaels are entitled to an administrative expense claim against Debtor's bankruptcy estate in the amount of $1,133.13. The Court will enter a separate order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

-22-

Date entered on docket: January 12, 2023

COPY TO:

Jeff Carmichael
Sherry Evans-Carmichael
4007 Sycamore Street
Los Alamos, NM 87544

Christopher M. Gatton
Attorney for Debtor
Giddens & Gatton Law, P.C.
10400 Academy NE, Suite 350
Albuquerque, NM 87111